IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
UNITED STATES OF AMERICA      )
                              )
        v.                    )      No. 1:19-CR-362
                              )
BRIAN M. CARPENTER,           )
                              )
        Defendant.            )
```

FILED

JUL 10 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## STATEMENT OF FACTS

The United States and the defendant, BRIAN CARPENTER, stipulate that the allegations

in Count One of the Indictment and the following facts are true and correct. The parties further

stipulate that had the matter gone to trial, the United States would have proven the allegations in

Count One and the following facts beyond a reasonable doubt.

### I.      Factual Background

1.      The defendant, BRIAN M. CARPENTER ("CARPENTER"), was the owner and

operator of a company called the Flintstone Group which, among other things, facilitated the sale

and distribution of janitorial products. Flintstone Group was created on or about July 29, 2011.

At all times relevant to the instant offense, its business address was located in Leesburg,

Virginia, within the Eastern District of Virginia.

2.      CARPENTER and the Flintstone Group purchased janitorial products through

Company #1, which was co-owned and operated by A.I. In addition to Company #1, A.I. was the

sole owner of two other companies – Company #2 and Company #3.

3.      The Washington Metropolitan Transit Authority ("WMATA") is an interstate

transportation agency which operates transit service in the Washington metropolitan area.

1

4.      D.B. was employed by WMATA for approximately 27 years. From in or around 2012, until on or about June 5, 2015, D.B. was an Assistant Superintendent of Grounds Maintenance & Custodial Services ("GMAC"). D.B. was primarily responsible for overseeing janitorial services on the Orange, Blue, and Silver lines of metro. D.B.'s office was located in Falls Church, Virginia.

5.      KIRBY FITZGERALD SMITH ("SMITH") was employed by WMATA for approximately 26 years. From in or around 2013, until on or about June 5, 2015, SMITH was an Assistant Superintendent of GMAC. SMITH was primarily responsible for overseeing janitorial services on the metro's Red Line. SMITH's office was located at the Metro Center station in Washington, D.C.

6.      B.F. was employed by WMATA for approximately 26 years and was the Manager of Special Projects for GMAC. B.F. was a long-time friend of CARPENTER who introduced D.B. and SMITH to CARPENTER.

7.      Upon becoming Assistant Superintendents, D.B. and SMITH were given WMATA purchase cards to make necessary purchases for their stations, including janitorial supplies for cleaning and maintenance of the stations. B.F. approved purchase card expenses for D.B. and SMITH and also had a WMATA purchase card for business use.

8.      After meeting CARPENTER, D.B. and SMITH agreed to begin ordering janitorial products from the Flintstone Group.

9.      CARPENTER used Company #1 to satisfy orders he received from D.B., SMITH, and B.F.

2

10.     Products SMITH, D.B., and B.F. ordered from CARPENTER included a chemical enzyme solvent called "Blitz," stainless steel wipes, Dawn II floor cleaner, microfiber cloths, urinal and toilet mats, and a degreaser citrus solvent called "DG-28."

11.     "Blitz" and "DG-28" were products that were specifically created and labeled by one manufacturer, Manufacturer #1. Each product name stemmed from CARPENTER's time as a professional football player.

## II.     Criminal Conduct

12.     As described in greater detail below, from at least in or around January 5, 2013, and continuing through at least March 12, 2015, in the Eastern District of Virginia, and elsewhere, defendant CARPENTER, KIRBY FITZGERALD SMITH, D.B., and others known and unknown, did knowingly conspire and agree with each other to commit wire fraud, that is having knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

13.     More specifically, it was the purpose of the conspiracy to engage in a purchase card scheme whereby, at least SMITH and D.B., would use their WMATA-issued credit cards to order janitorial supplies for metro stations from CARPENTER that, in many instances, would never be delivered. Instead, on these occasions, CARPENTER would keep the amount charged to the purchase cards and his co-conspirators would receive, in some instances, cash payments

3

for having charged the WMATA-issued purchase cards. CARPENTER spent the money he fraudulently obtained at least in part for his own personal use and benefit.

14.    SMITH and D.B. provided CARPENTER with their purchase card numbers so that they need not be present or even involved in the transactions when the cards were run by the processors.

15.    Because D.B.'s and SMITH's purchase cards had a $3,000 per purchase limit and a maximum charge amount of $20,000 per month, CARPENTER used a host of companies ("processors") to run the purchase cards and process the charges on CARPENTER's behalf at a more rapid rate. The processors were typically given a fee of approximately 15% of the total invoice amount, and they returned the remaining 85% of the invoiced amount to CARPENTER. CARPENTER spent money obtained from these processors for his own personal use and benefit.

16.    In total, CARPENTER solicited at least 10 different processors to run transactions from SMITH's, D.S.'s, and B.F.'s WMATA-issued purchase cards.

17.    In furtherance of the scheme and artifice to defraud, CARPENTER emailed fake and fraudulent invoices to processors claiming that a host of products were being ordered that in fact CARPENTER either never ordered or never provided to WMATA. The processors then charged D.B.'s and SMITH's WMATA purchase cards in the amount listed on the invoices and wrote checks to CARPENTER for the amount he was owed. Subsequently, D.B. and SMITH received cash payments. WMATA did not receive the products for which it was charged. At the end of each month, D.B. and SMITH fraudulently certified with WMATA that all products were ordered and delivered as outlined on the invoices.

4

18.     For example, on or about September 29, 2014, CARPENTER sent an email to a processor containing a sales order for SMITH's card for 23 cases of stainless steel cleaner towels. That same day, SMITH's card was charged $2,954.12. On or about September 30, 2014, CARPENTER deposited four checks into his bank account totaling $20,278.72, which included the amount he received from the processor for the previous day's charge to SMITH's WMATA purchase card. Subsequently, on or about October 2, 2014, SMITH deposited $1,700 cash into his Capital One Bank account in Burke, Virginia, within the Eastern District of Virginia. As CARPENTER and SMITH knew, WMATA never received the 23 cases of stainless steel cleaner towels from this order, and CARPENTER retained the proceeds of the fraudulent charge for his own personal use and benefit.

19.     In or around December 2014, the Office of the Inspector General for WMATA (WMATA-OIG) began investigating whether the janitorial products ordered and paid for on were, in fact, being delivered.

20.     In or around January 2015, in an effort to conceal the fact that CARPENTER had accepted payments from WMATA for products that CARPENTER knew were never delivered, CARPENTER, SMITH, and D.B. made a large delivery of products to WMATA.

21.     On or about February 1, 2015, CARPENTER was interviewed by WMATA-OIG. At that interview, WMATA-OIG requested invoices for products that SMITH and D.B. ordered in September and October of 2014.

22.     On or about March 12, 2015, CARPENTER, through an attorney, submitted a letter to WMATA claiming that substantially all of the products ordered by SMITH and D.B. during September and October 2014 had been substituted for other products.

5

23.     Additionally, because CARPENTER knew he had not, in fact, ordered the products as he claimed during his interview with WMATA-OIG, CARPENTER, through A.I., directed an employee of Company #1 to alter invoices for the products in an effort to convince the WMATA-OIG that some products had indeed been ordered and delivered to WMATA. On or about March 12, 2015, CARPENTER, through his attorney, provided those doctored invoices to WMATA-OIG.

24.     In total, the following quantities of products were ordered using D.B.'s, SMITH'S, and B.F.'s purchase cards:

| Product | Quantity Ordered |
|---------|------------------|
| Blitz | 1,200 |
| Stainless steel wipes | 631 |
| Dawn II floor cleaner | 622 |
| Microfiber cloths | 44,160 |
| Urinal and toilet mats | 3,024 |
| DG-28 | 605 |

25.     Including those products that were delivered in January 2015, at most, CARPENTER ordered the following quantity of each product:

| Product | Quantity Ordered from Manufacturers |
|---------|-------------------------------------|
| Blitz | 293 |
| Stainless steel wipes | 166 |

6

| Dawn ll floor cleaner | 324 |
|---|---|
| Microfiber cloths | 6,948 |
| Urinal and toilet mats | 48 |
| DG-28 | 88 |

26.     As a result of the CARPENTER's fraudulent scheme, the defendant admits that that WMATA spent at least $310,636 on products that were never delivered.

III.     **Conclusion**

27.     This statement of facts includes those facts necessary to support the plea agreement between CARPENTER and the United States. It does not include each and every fact known to CARPENTER or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case. CARPENTER acknowledges that the foregoing statement of facts does not describe all of CARPENTER's conduct relating to the offenses charged in this case.

28.     The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: 

Jamar K. Walker
Heidi B. Gesch
Assistant United States Attorneys

7

After consulting with my attorney(s) and pursuant to the plea agreement entered into this day between the defendant, BRIAN CARPENTER, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

BRIAN CARPENTER
Defendant

I am Pleasant Brodnax/Robert Jenkins, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Pleasant Brodnax
Robert Jenkins
Counsel for Defendant, Brian Carpenter

8