IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1:19-cr-362 |
| v. ) | |
| ) | The Hon. Liam O'Grady |
| BRIAN M. CARPENTER, ) | |
| ) | Sentencing Date: December 15, 2020 |
| Defendant. ) | |

**<u>United States' Sentencing Position</u>**

The United States of America, through undersigned counsel and in accord with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual ("Guidelines"), hereby provides its position with respect to sentencing for defendant Brian M. Carpenter. The United States requests that the Court adopt the findings of the Pre-Sentence Investigation Report ("Revised PSR"), resulting in an advisory Guidelines range with respect to incarceration of 46–57 months.

Based on the plea agreement entered into by the parties and in accord with the § 3553(a) factors, the government recommends to the Court that the defendant receive a sentence of 6 months incarceration, three years of supervised release, and full restitution and forfeiture as outlined in greater detail below. Such a sentence would account for the defendant's leadership role in creating and directing a fraud conspiracy that caused more than $330,000 in losses to the Washington Metropolitan Area Transit Authority ("WMATA")—a scheme that not only involved affirmative misrepresentations but also included attempts to obstruct the government's investigation. A custodial sentence of six months would further provide specific deterrence for this defendant, who was driven by greed to commit this crime, and general deterrence of crimes like the defendant's that are rooted in public corruption and cause harm to governmental agencies.

1

I.   **Factual Background**[1]

The defendant is a 60-year-old Michigan native and Virginia resident.

From 1982 to the 1986, the defendant was a member of various football teams in the National Football League ("NFL"). After his stint in the NFL, the defendant began running janitorial supplies businesses in 1993. His first such company filed for bankruptcy in 2010—resulting in over $1 million in company debts being discharged.

Subsequent to declaring bankruptcy, the defendant created Flintstone Group ("Flintstone"). Flintstone provided janitorial and cleaning products to a number of clients in the Washington, DC metropolitan area, including WMATA. However, rather than lawfully supply products to WMATA, the defendant created a scheme through which he benefited financially by accepting payment from WMATA for products he never delivered.

Three WMATA employees—Kirby Smith, D.B., and B.F.—agreed to permit the defendant, through Flintstone, to charge their WMATA-issued credit cards for supplies that were, in many instances, never received by WMATA. In exchange for the WMATA employees' participation in the fraud conspiracy, the defendant provided them with cash payments.

To effectuate the scheme and to enable the defendant to charge more money to the WMATA employees' credit cards, the defendant solicited a number of additional individuals to process the cards on his behalf who were permitted to pocket approximately 15% of the charged amount. Then, to further conceal the fraud from WMATA, the WMATA employees, after receiving fake and fraudulent invoices from the defendant, falsely certified that they did, in fact,

---

[1] The PSR and the Statement of Facts ("SoF") signed by the defendant (Doc. No. 28) adequately set forth the offense conduct in this case.

2

receive all of the products they ordered. In total, WMATA paid more than $330,000 for products it never received.

The WMATA Office of Inspector General (OIG) began investigating this case in December 2014. After WMATA-OIG interviewed a number of its employees, including Smith, the defendant arranged a large delivery of janitorial products in January 2015 in an effort to cover up the crime.

The defendant's attempts at concealment did not stop with this delivery. Quite the contrary, when he was interviewed by WMATA-OIG in February 2015, the defendant claimed that every product ever ordered by WMATA was in fact delivered. WMATA then requested product invoices for two months of the previous year for charges made to Smith's and D.B.'s purchase cards. Again, the defendant lied. Through his attorney at the time, the defendant submitted altered invoices for the products and for the first timed claimed that a number of products ordered by WMATA had been substituted for other entirely different products.

On December 10, 2019, the grand jury returned a five-count indictment against the defendant, charging him with conspiracy to commit wire fraud (count one) and wire fraud (counts two through five), in violation of Title 18, United States Code, Sections 1349 and 1343.

On July 10, 2020, the defendant pleaded guilty to count one of the indictment.

**II.     Guidelines Calculation**

As the Court is well aware, although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009). Here, the Revised PSR found a base offense level of 7; a 12-level enhancement for loss greater than $250,000 but less than $550,000; a 4-level

enhancement for the defendant's role as an organizer and leader of the criminal activity that involved five or more participants; a 2-level enhancement for obstruction of justice, and a 3-level reduction for acceptance of responsibility. In total, the Revised PSR found an advisory Guidelines range of 46–57 months.[2]

The defendant raised two objections to the Revised PSR. First, the defendant has objected to the 4-level increase for the defendant's role as an organizer or leader of the offense. And second, the defendant objected to the 2-level increase for obstruction of justice. Both the defendant's objections should be overruled.[3]

> *A. The Revised PSR correctly applies a 4-level enhancement as the defendant was an organizer or leader of criminal activity that involved five or more participants.*

Pursuant to § 3B1.1(a), "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The defendant claims that he did not organize or lead the conspiracy in such a way that warrants the application of this enhancement.

The Guidelines list seven factors for this Court to consider in determining whether the defendant played an organizational or leadership role:

> the exercise of decision[-]making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n. 4; *see also United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002).

---

[2] The defendant's advisory Guidelines range is also based upon a criminal history score of two which results in a category II criminal history.

[3] The parties also disagree about the total amount of restitution owed to the victim, WMATA. The United States will address the restitution calculation in section III of this sentencing memorandum.

4

Consistent with the Guidelines, courts in this circuit have routinely held that defendants who recruit others, control the allocation of profits, and handle the logistics and arrangements of the transactions qualify for this enhancement. *See United States v. Perez*, 570 F. App'x 309, 311 (4th Cir. 2014) (affirming application of enhancement where defendant in fraud scheme controlled the activities of another participant in the scheme, made decisions about allocation of fraud proceeds, and was involved in logistics and organization). *Compare with United States v. Cameron*, 573 F.3d 179, 185 (4th Cir. 2009) (finding district court erred in applying enhancement for role as leader or organizer in a counterfeiting case where there was no evidence in the record that defendant "planned or organized the operation, exercised any control or authority over other participants, recruited accomplices into the operation, or claimed *any* share—much less a larger share—of the fruits of the criminal activity."). *See also*, *United States v. Gibbs*, 547 F. App'x 174, 184 (4th Cir. 2013); *see also United States v. Jones*, 356 F.3d 529, 539 (4th Cir. 2004) (affirming application of enhancement where defendant recruited dealers, controlled allocation of drugs to dealers, determined how profits were divided, and handled the logistics and arrangements for the transactions); *United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997). Finally, "the aggravating role adjustment is appropriate where the evidence demonstrates that the defendant controlled the activities of other participants or exercised management responsibility." *United States v. Llamas*, 599 F.3d 381, 390 (4th Cir. 2010)*; see also United States v. Thorson*, 633 F.3d 312, 318 (4th Cir. 2011).

Nearly each Guidelines factor listed above suggests that this defendant qualifies for the enhancement. First, the defendant recruited and enlisted WMATA employees to participate in the conspiracy. PSR ¶ 51. In addition, there is no dispute that the defendant did, in fact, receive the larger share of the fruits of his crime. And of course he did – after all, as the architect of the scheme,

it flows logically that the defendant would profit most handsomely from it. The defendant's scheme also involved an extensive level of coordination. In addition to the arrangements he made with the WMATA employees to fraudulently charge their purchase cards, the defendant also enlisted 10 additional individuals (the credit card processors) to participate in his fraud scheme. *See* SoF ¶ 15–16. Moreover, at least Smith and D.B. provided the defendant with their purchase card numbers directly such that they need not be present when the transactions were run by the processors. Simply put, the defendant organized, controlled, and profited most from the crime. Given his role, the enhancement should apply.[4]

      *B. The Revised PSR accurately includes a 2-level enhancement for obstruction of justice.*

Section 3C1.1's two-level enhancement applies when the defendant attempts or successfully obstructs or impedes "the administration of justice with respect to the investigation, prosecution . . . and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct . . . ." U.S.S.G. § 3C1.1. The Revised PSR found that the defendant obstructed justice when he, through his former attorney, submitted altered invoices to the WMATA-OIG in connection with the investigation that ultimately led to the instant charges. PSR ¶ 57. The defendant claims that this enhancement does not apply because there is no evidence that the defendant caused the false documents to be submitted to WMATA.

The defendant's claim seems incredible in light of the sworn admissions he made in the signed statement of facts in this case. Specifically, the defendant admitted that he caused the altered invoices to be created when he, through his cohort A.I., "directed an employee . . . to alter invoices for the products in an effort to convince the WMATA-OIG that some products had indeed been

---

[4] Even if the Court finds that the defendant's role does not merit a 4-level increase, the defendant should, at a minimum, receive a 3-level or 2-level increase pursuant to § 3B1.1(b)–(c).

6

ordered and delivered to WMATA." SoF ¶ 23. The defendant clearly knew at the time of this interview that he had not in fact delivered all of these products. While ultimately his attorney provided the document to WMATA-OIG, it was *the defendant* who caused the creation and ultimate submission of this document in connection with this investigation and his associated relevant conduct. Accordingly, the two-level enhancement for obstruction of justice plainly applies.

### III. Restitution

Pursuant to his written plea agreement, the defendant acknowledges that WMATA has suffered "at least" $310,636.00 in losses associated with the defendant's fraud scheme; however, the parties disagree about the total amount of losses suffered by WMATA. *See* Doc. No. 27 at ¶ 9. In particular, the United States seeks restitution in the amount of $330,664.00.

The crux of the parties' dispute centers around $20,028 in charges made to B.F.'s WMATA-issued credit card. To assist the Court in resolving this dispute and to provide the basis for the United States' loss calculation, the Declaration of FBI Special Agent William Novak (hereinafter "Novak Declaration") is attached to this sentencing position. And further attached to the Novak Declaration is an exhibit which details the complete calculations for each of the six products that are listed in paragraphs 24 and 25 of the statement of facts and that form the basis of the United States' loss calculation.

As an initial matter, and as the Novak Declaration notes, the United States' loss calculation is favorable to Carpenter for several reasons. First, the loss calculation only includes six of the products that WMATA ordered from the defendant. Second, the loss calculation gives the defendant credit for the January 2015 delivery that was part of his attempt to cover up the crime and that occurred after the investigation into his fraudulent conduct took place. Third, and perhaps

7

most importantly, every product that the defendant and A.I. ordered from its manufacturers is credited as being delivered to WMATA. As the defendant himself has freely acknowledged, WMATA was not the defendant's only client, and so naturally some of the products he ordered from his manufacturers must have satisfied other orders. In addition, law enforcement observed some of these ordered products in A.I.'s warehouse. Nevertheless, the United States gave the defendant credit for all products ordered against the loss calculation.

Finally, defendant's claim that all products ordered by B.F. were not fraudulent belies a fundamental misunderstanding of the way this scheme worked. Each WMATA employee's card was charged for a specific number of products at a given time. As such, the employees were responsible for providing invoices and/or receipts that support the charges made to their cards. However, there was a finite universe of products that were ordered from the manufacturers. And as the Novak Declaration explains, that universe of supplies would have been used to satisfy orders from all three employees. So, in this instance, if 100 units of Blitz are ordered from the manufacturer, but Smith, D.B., and B.F. have each charged 100 units to their card, then there can only be 100 units of Blitz to satisfy all three orders. Consequently, assuming that B.F.'s order was completely fulfilled would necessarily mean that Smith and D.B.'s could not be, and as such, would have resulted in WMATA suffering the same harm, irrespective of who made the charges. Put another way, the defendant's claim that B.F.'s orders were delivered in their entirety only means that the losses associated with Smith and D.B. are higher and thus, WMATA nevertheless suffered the same amount of harm.

The United States respectfully submits that the Court should find restitution owed in the amount of $330,664.00.[5]

## IV. Section 3553(a) Factors

As the Court is also well aware, after calculating the Guidelines, a sentencing court must then consider that Guidelines range, as well as the sentencing factors set forth in § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to § 3553(a)'s enumerated factors, of particular pertinence here are the "nature and circumstances of the offense," the need for the sentence "to reflect the seriousness of the offense," "the history and characteristics of the defendant," the need "to promote respect for the law," the need for the sentence "to afford adequate deterrence to criminal conduct." § 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(7).

> A. *The nature and circumstances of the defendant's offense suggest that the defendant's crime was unquestionably serious.*

The defendant's crime was unquestionably serious. Indeed, it is a serious offense whenever a defendant steals from a governmental agency for his own personal benefit and for the benefit of his co-conspirators. The defendant's crime was even more serious, however, because of his repeated, conscious, decisions to lie and to defraud WMATA. Undoubtedly, the defendant felt emboldened by the initial success of his scheme and continued his fraudulent conduct for nearly two years. His scheme was well thought out and well-executed. He was sophisticated enough to understand the checks and balances that WMATA put in place to ensure their employees were not

---

[5] The United States has attached proposed orders of restitution to this sentencing position which respectively contain the amounts claimed to be owed in restitution. In addition, the United States has attached a consent order of forfeiture which has been agreed upon by the parties.

9

overspending on their cards. And so, to make it appear that these employees were purchasing from a host of different vendors (thus minimizing the likelihood that WMATA would detect that something nefarious was ongoing), the defendant solicited ten individuals to process these credit card transactions—individuals who, almost to a person, had no knowledge whatsoever of the janitorial supply business and most of whom never even met the individuals whose cards were charged.

Previously, the defendant has made much of the idea that the WMATA employees were the worst actors in this case because they were the actual public officials. While it obviously the case that the defendant's scheme could not have occurred but for the willingness of WMATA employees to deceive their employers for profit, there is no doubt that Brian M. Carpenter was the architect of this scheme and that he profited the most from it. Given his role as the leader of this scheme and as the person who benefited the most from its existence, it follows logically that he should suffer the harshest consequences.

And it is not just that the defendant engaged in fraud and failed to admit his wrongdoing as soon as this investigation begin. Quite the contrary, and as has been detailed previously, the defendant went to great lengths to cover up his crime – by making a large delivery to WMATA in January 2015 after he knew his conduct was under investigation and by submitting fraudulent altered invoices to WMATA-OIG after they confronted the defendant with their concerns that WMATA had been charged for products that were never delivered. Again, when initially presented with the opportunity to correct his behavior, the defendant chose to lie in hopes that his efforts would dissuade investigators from uncovering the truth.

That is why, consistent with the contours established in its plea agreement with the defendant, the United States recommends a period of six months incarceration.

B. *The defendant's personal history and characteristics demonstrate that he consciously chose to violate the law.*

The defendant attended one of the premier public universities in this country and played football there. After his football career ended, he started a janitorial supply business. While ultimately that business ended with the defendant filing bankruptcy, it is clear that the defendant knew full-well how to live a life as a law-abiding citizen, and yet in this case, he chose not to. Moreover, to the extent the defendant claims he made this decision based upon financial difficulties, his willingness to file bankruptcy previously suggests he also understands the lawful ways in which a businessperson can discharge debts if his or her entrepreneurial efforts fail. Simply put, the defendant had the life skills and the business acumen to start multiple businesses but rather than rely upon his experience, he chose to turn to fraud.

At the sentencing hearing for the defendant's co-conspirator, Kirby Smith, this Court expressed concern about his criminal history as it related to domestic disputes. It appears that those same concerns also apply to this defendant. It is ultimately the Court's role to weigh his criminal history in connection with the other 3553(a) factors and determine what impact the defendant's criminal history will have on fashioning a sentence that is sufficient but not greater than necessary as to this defendant, but the United States notes for the Court that the details outlined in Revised PSR surrounding this conduct are indeed concerning.

The defendant may claim that a probationary sentence or some sentence less than six months is appropriate in light of the circumstances surrounding his conduct. But such a claim simply does not square with the facts.

### C. *The Court should fashion a sentence that provides general and specific deterrence and affords respect for the law.*

As is the case with any white collar crime, deterrence is an important factor for the Court to consider. Many white collar crimes, by their very nature, are difficult to detect because the very factors that permit the crimes to occur in the first place can also be used to aid in their concealment. This case and the defendant's crime are no exception. And when individuals, like the defendant choose to lie and defraud a governmental agency, such decisions should be met with punishment that promotes respect for the law and that ultimately sends a message to other would-be Brian Carpenters that crimes like this will not be tolerated.

It is apparent that the defendant engaged in a cost-benefit analysis in which he decided that the risk of getting caught committing this crime was substantially outweighed by the potential to profit from the fraud. There can be no doubt that the defendant has pleaded guilty and thus, in that respect, accepted responsibility for his actions; however, the defendant has yet to express any remorse for his crime. And while the United States does not suggest that the defendant has shirked responsibility for his role in the instant offense, the lack of remorse demonstrated coupled with the United States current understanding of the defendant's mindset is indeed troubling.[6]

---

[6] Perhaps the defendant has not expressed remorse, because in some respects, he truly does not believe that the crime he committed is worthy of any. On September 29, 2020, counsel for the defendant was quoted in an article in the Washington Post regarding the instant offense and claimed that Carpenter was just "taking advantage of a Metro policy that allowed for the purchasing of supplies well in advance of when they might be needed and without immediate delivery." To date, the United States has found no such policy. Even if such a policy existed, it is certainly not a basis to lie, to cover up, and to conceal a crime by providing fictitious, altered invoices to WMATA. Nor is it a basis to provide the equivalent of kickbacks to WMATA employees. While it was not the defendant himself who made the claims in this article, whether he holds such beliefs would ultimately be important in determining the true nature of his acceptance of responsibility. *See* https://www.washingtonpost.com/local/trafficandcommuting/former-metro-manager-sentenced-for-fraud-in-scheme-with-former-nfl-player-brian-carpenter/2020/09/29/fb4d9876-028b-11eb-b7ed-141dd88560ea_story.html.

The importance of deterrence further underscores the need for the defendant to serve a period of active incarceration of 6 months.

## V. Conclusion

Accordingly, for the reasons stated herein, the United States requests that this Court sentence the defendant to six months incarceration, three years of supervised release, and full restitution and forfeiture as outlined in the proposed attached orders.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____/s/_____
Jamar K. Walker
Heidi B. Gesch
Counsel for the United States
Assistant United States Attorneys
U.S. Attorney's Office
2100 Jamieson Ave
Alexandria, VA
Phone: 703-299-3700
Fax: 703-299-3981
Email: jamar.k.walker@usdoj.gov
Email: heidi.gesch@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on December 8, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.

By: _____/s/_____
Jamar K. Walker
Counsel for the United States
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Ave
Alexandria, VA
Phone: 703-299-3700
Fax: 703-299-3981
Email: jamar.k.walker@usdoj.gov