**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 1:19-cr-362-LO** |
| **BRIAN CARPENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW Defendant Brian Carpenter, by counsel, and hereby submits his position with respect to sentencing, in accordance with this Court's policy regarding sentencing, 18 U.S.C. §3553(a), and the sentencing principles set forth in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 127 S. Ct. 2456 (2007), *Kimbrough v. United States*, 128 S. Ct. 558 (2007), *Gall v. United States*, 128 S. Ct. 586 (2007) and *Nelson v. United States*, 129 S.Ct. 890 (2009).

Mr. Carpenter submits that the appropriate sentence to be imposed is a term of home confinement in light of the COVID-19 and related considerations set forth in the United States Sentencing Commission Guidelines Manual (the "Guidelines"). Mr. Carpenter further submits the requested sentence is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553. In support of this request, Mr. Carpenter sets forth his position herein below.

Title 18 U.S.C. § 3553(a) contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing.[1] Given the rate of infection in the Bureau of Prisons ("BOP") is 5.5 times higher than the general population,[2] this Court should examine this requirement in a manner that takes cognizance of the extraordinary current prevailing conditions that may be life threatening.

---

[1] *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)); *see also Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020).

[2] Saloner B, Parish K, et al., *COVID-19 Cases and Deaths in Federal and State Prisons* E1, J. of Am. Medicine (July 8, 2020), https://bit.ly/3a4604x.

The United States is experiencing an unprecedented surge in the spread of COVID-19 at the time of this memorandum.[3] Accordingly, any time Mr. Carpenter spends in prison will necessarily be more severe than it ordinarily would. The Court should account for the oppressive nature of confinement within the context of these extraordinary circumstances, unprecedented in U.S. history, by keeping Mr. Carpenter in the community by departing _or_ varying below the Guidelines range.

In support of this request, Mr. Carpenter sets forth his position herein below.

## I. BACKGROUND

Mr. Carpenter appears before the Court after having pled guilty to Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C.§ 1349, a Class C Felony.

The presentence investigation report ("PSR") determined the United States Sentencing Guidelines ("Guidelines") subjects Mr. Carpenter to a guideline range of 46 to 57 months, based upon a total offense level of 22 and a criminal history category of II. Mr. Carpenter disagrees with the PSR's assessment of the Guidelines range applicable to his case.

Specifically, Mr. Carpenter disagrees with (1) the characterization of his role in the criminal conduct as a "leader" and (2) the PSR's conclusion that he obstructed justice.

## II. OBJECTIONS TO PSR

### *A. Role in The Offense*

The defendant objects to the role in the offense adjustment. While Mr. Carpenter readily admits the offense conduct involved multiple participants, he maintains that he did not manage or organize the participants. In addition, Mr. Carpenter did not direct or lead the conspiracy. Instead, the conspiracy involved several co-conspirators who played various roles. Although Mr. Carpenter's role may have been unique, he cannot properly be characterized as qualifying

[3] See: https://www.nytimes.com/live/2020/10/30/world/covid-19-coronavirus-updates

for the adjustment. Moreover, there is an uncharged coconspirator, A. I., who received 60% of the proceeds from the offense conduct, with the remainder going to Mr. Carpenter.

In addition to receiving a larger share of the proceeds of the offense conduct, A.I. and Carpenter were equally involved in the participation and planning of the scheme. The government, for unknown reasons, has decided to deliberately ignore another person just as equally culpable as Mr. Carpenter, this leaving him as the only person who can be classified as a "leader" under the narrative placed before this Court.

It is simply unwarranted to adjust the Guidelines upward and assess a leadership role for Mr. Carpenter when there is another, equally culpable, uncharged individual who will never appear before this Court as a defendant.

### *B. Obstruction of Justice*

The defendant objects to the application of the obstruction of justice enhancement. The defendant does not dispute the facts concerning information submitted on his behalf by his attorney during the internal investigation of WMATA. Mr. Carpenter maintains the actions of a third party can not properly be used to support an obstruction of justice enhancement. Moreover, the same uncharged individual, A.I, was the person who actually created the invoices which were ultimately given to WMATA.

The enhancement for obstruction of justice applies to the act of the defendant and not someone acting on his behalf. The record in this matter is devoid of any reliable evidence that the defendant "caused" the allegedly false documents to be submitted. In order to justify applying the enhancement under the current facts of the case the Court would need to assume that the records submitted by Mr. Carpenter's then attorney were at his "command." Again, there is no evidence to support such a conclusion.

## III. SENTENCING FACTORS

### *A. Overview*

For the past 14 years, not only have courts had wide discretion to impose non-Guidelines sentences, but the "effectively advisory" guidelines are not even to be "presumed reasonable." *Nelson* at 892. The guidelines are only "the starting point and the initial benchmark" of a sentencing analysis. Gall, 552 U.S. at 49. A district court conducts "its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 184 (2d Cir. 2008).

The sentencing factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to: (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established for: (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

(5) any pertinent policy statement – [...];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a)(1)-(7). Ultimately, the overarching goal of sentencing is to ensure that a sentence is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing.

### *B. History & Characteristics of Mr. Carpenter and the Nature & Circumstances of the Offense (§ 3553(a)(1))*

#### *1. Mr. Carpenter's History & Characteristics*

Brian Carpenter was born in 1960, in Flint, Michigan. His father died in 1992 and his mother in 2016. He has two living siblings, with another two having died from various ailments.

He was raised by his parents in a safe community in Flint, Michigan and resided in the same home for the duration of his upbringing. His mother and father were both gainfully employed and maintained a supportive home environment. Carpenter played sports and eventually graduated from the University of Michigan.

Mr. Carpenter is a 60-year-old African American who, while currently maintaining good physical health, has had two surgical procedures in his life, one in the late 1980's and one in the early 1990's, after suffering a collapsed lung due to injuries from playing football. He requires a continuous positive airway pressure (CPAP) machine while sleeping. His physician, Scott Nagell, MD, who has taught medical students on a regular basis since 1991 and is on the faculty of the UVA School of Medicine, has opined that Mr. Carpenter would be "high risk for severe respiratory complications" should "he be exposed to and contract the COVID-19 virus." Exhibit A. Mr. Carpenter has been under the medical care of Dr. Nagell for almost 20 years.

Mr. Carpenter asks the Court weigh the increasing number of COVID-related infections and deaths in Virginia and the rest of the country in determining whether a term of incarceration is warranted under the circumstances of this case. Mr. Carpenter has medical conditions which place him in a category of being significantly impacted by the COVID-19 virus should he be incarcerated.

*2. **Nature & Circumstances of the Offense***

Mr. Carpenter is the first to admit that his actions were wrong and he sincerely regrets his conduct. He has accepted full responsibility for his role in the scheme, and has demonstrated appropriate remorse for his misconduct. Mr. Carpenter is proposing this Court impose a reasonable sentence that will reflect the serious nature and circumstances of this offense, while not exceeding sentencing purposes recognized by this Court.

WMATA has a policy which allows a vendor to receive advance payments, partial payments and progress payments during the performance of a contract to retain products which have been

ordered. Contrary to the erroneous position of the government, the policy clearly does exist.[4] Specifically, policy 5-3 in relevant part states as follows:

> 5-3 CONTRACT FINANCING PAYMENT METHODS
>
> (a) Contract financing payment means an authorized Authority disbursement of monies to a contractor prior to the acceptance of supplies or services by the Authority. Contract financing payment methods include advance payments, partial payments, and progress payments, which are generally described as follows:
>
> (b) Advance payments are advances of money by the Authority to a prime contractor before, in anticipation of and for the purpose of complete performance under one or more contracts. They are expected to be recovered from payments due to the contractor incidental to performance of the contract(s). Advance payments may be made to prime contractors for the purpose of making advances to subcontractors.

Mr. Carpenter acknowledges that he, A.I. and a WMATA employee exploited a loophole in the procurement policy which permitted this offense conduct to occur and go unnoticed. He regrets his conduct and agreement with A.I and the WMATA employee to break the law.

Mr. Carpenter takes responsibility for his role in the offense, wants to improve his life and contribute constructively to his family and his community.

**C. Remaining Factors of 18 U.S.C. § 3553(a)**

***1. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Provide Just Punishment, to Avoid Unwarranted Sentence Disparities, and to Promote Respect for the Law***

As the Court reflects upon the person being sentenced, Mr. Carpenter urges the Court to consider – under the COVID-19 world which is not a factor considered under the Guidelines – that a term of home detention will reflect the seriousness of the instant offense, promote respect for the law, provide just punishment, and avoid unwarranted sentence disparities. The requested sentence will provide just punishment for the offense and will adequately restrict Mr. Carpenter from a normal life.

[4] https://www.dropbox.com/s/46ywdsj5da7o9s6/WMATA-Procurement-Procedures-Manual-Revision-7-4-1.pdf?dl=0

### *b. The Requested Sentence Can Provide Adequate Deterrence, and Protect the Public from Future Offenses by Mr. Carpenter*

A term of home detention will provide adequate general and specific deterrence under the unique circumstances of the COVID-19 pandemic. The available empirical data does not support the conclusion that increased punishment leads to increased deterrent effects.[5] Nonetheless, the requested sentence sends a powerful message to the community that this type of white-collar crime will not be tolerated. In addition, the requested sentence will provide specific deterrence while Mr. Carpenter remains detained for a term of months, followed by a term of supervised release, during which he can be sent to prison upon the violation of any release condition.

### ***c.* Adverse Impact *on Unrelated Parties***

Mr. Carpenter is the owner of a janitorial services/supplies company that employs 30+ individuals. Active incarceration for the period of time sought by the government would undoubtedly be injurious not only to his employees, but to their families as well.

## IV. THE COURT SHOULD IMPOSE A VARIANT SENTENCE

### A. The Need for the Sentence Imposed To Provide Just Punishment For the Offense — 18 U.S.C. § 3553(a)(2)(A)

This Court may take into account the harshness of prison conditions when assessing the severity of the sentence. *United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007), citing *Koon v. United States*, 518 U.S. 81, 111–12 (1996). Further, lock-down measures instituted by prisons across the country in order to mitigate the spread of the pandemic have made confinement much more punitive than was contemplated at sentencing. *United States v. Indarte*, 2020 WL 6060299, at *4 (W.D. Wash. Oct. 14, 2020).

---

[5] Valerie Wright, Ph.D., "Deterrence in Criminal Justice," The Sentencing Project (November 2010)( https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/ ("...the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"), quoting Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O. Wikstrom, "Criminal Deterrence and Sentence Severity: An Analysis of Recent Research," Oxford: Hart Publishing (1999).

To determine the just punishment in this case, the Court should consider the life-threatening conditions under which Mr. Carpenter will serve his sentence. In order to mitigate the spread of COVID-19 in the BOP, Mr. Carpenter will likely be incarcerated with limited programming and movement and unreliable access to family. In March 2020, BOP modified its operations to respond to the spread of COVID-19. All visitation from family and friends was suspended and individuals were limited in their movements to prevent congregate gathering and maximize social distancing.[6] While the BOP's website claims movement exceptions are made to permit showers three times a week, telephone and email access, commissary, and laundry, these most basic activities have not always been permitted. Additionally, evidence clearly establishes that the use of solitary confinement has been used as a substitute for safe and proper management of the BOP inmates."[7]

Mr. Carpenter will not only be subject to oppressive incarceration conditions, but he will also be at risk of contracting COVID-19; a life-threatening disease. Guidance from the Centers for Disease Control and Prevention ("CDC"), such as social distancing, is simply "impossible to achieve in our federal prisons"[—particularly during a lockdown]. Incarcerated individuals cannot socially distant themselves as they share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to one another, lack the freedom to bathe regularly, and are unable to effectively disinfect their surroundings.

**B. The Need for the Sentence Imposed To Provide The Defendant With Medical Care — 18 U.S.C. § 3553(a)(2)(D)**

In addition to BOP being unable to provide safe incarceration conditions during the COVID-19 pandemic, Mr. Carpenter's age and physical condition put him at a higher risk of severe

---

[6] Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Nov. 6, 2020).

[7] Solitary Watch, *Solitary Confinement is Never the Answer* (June 2020), https://bit.ly/3gL1IR9; See also, e.g., Sentencing Resource Counsel for the Federal Public and Community Defenders, *The Worsening COVID-19 Crisis in Federal Detention* (July 30, 2020), https://bit.ly/3knrYUL

illness or death he contracts COVID-19 and the BOP cannot effectively protect him from this unwarranted risk.

Dr. Nagell's letter and the PSR sets forth medical conditions which support the imposition of a term of home confinement. The BOP has proven unable to provide effective medical care for people with prior existing medical conditions like Mr. Carpenter. In 2016, DOJ's Office of Inspector General (OIG) found that BOP experienced chronic medical staffing shortages and failed to take adequate measures to address them, endangering the safety and security of its institutions.[8]

Further, BOP's inability to care for aging individuals is well-documented. Even prior to COVID-19, BOP lacked appropriate staffing levels and infrastructure to meet the needs of aging individuals.[9] Mr. Carpenter could wait months for even routine medical equipment—like glasses or dentures.[10] Because of his advanced age, he is at particularly high-risk for severe complications if he were to contract the virus.

Furthermore, despite deaths due to COVID-19 related illnesses, the BOP's ability to provide effective medical care has only deteriorated.[11] The BOP has failed to implement large

---

[8] U.S. Dep't of Justice Office of the Inspector Gen., *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* i-ii, 1-2 (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf.

[9] U.S. Dep't of Justice, Office of the Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* i-ii (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf.

[10] *Aging Inmate Population*, at 17-19.

[11] See, e.g., U.S. Dep't of Justice, Office of the Inspector Gen., Pandemic Response Report: Remote Inspection of Federal Correctional Complex Lompoc 9-10 (July 2020), https://bit.ly/3a3ICUR (confirming that FCC Lompoc's failed COVID-19 response was, in part, due to "several key leadership vacancies across the complex and [that the complex] did not have communications protocols in place to fully inform staff about the spread of the virus"); Class Action Petition for Writ of Habeas Corpus, Hallinan v. Scarantino, No. 20-hc-2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-18, at 7 (Declaration of Dr. Chris Beyrer) ("BOP's actions (or inaction) fail to follow the most basic infection control measures"); Complaint, Wilson v. Ponce, No. 20-cv-4451 (C.D. Cal. May 16, 2020), ECF No. 1, at 99 (Declaration of Shamsher Samra, MD) ("it is questionable whether the healthcare system at Terminal Island is even capable of responding to the dire situation it now faces"); Facility Evaluation: Metropolitan Detention Center COVID-19 Response, Chunn v. Edge, No. 20-cv-1590 (E.D.N.Y. Apr. 30, 2020), ECF No. 72-1, at 2 ("Not only is MDC [Brooklyn] ill-equipped to identify cases of COVID-19 within its population, but it has not implemented adequate infection control practices. In fact, it is my assessment that several current practices in MDC actually promote a more rapid spread of COVID-19. . .").

scale testing. Less than 49 percent of BOP-incarcerated individuals have been tested and testing capabilities vary from facility to facility.[12]

The medical treatment Mr. Carpenter currently receives at home is far superior to the subpar medical attention he would receive in any BOP facility. He is able to maintain social distancing and attend to his conditions in a more comprehensive manner.

**C. Duties of the U.S. Sentencing Commission — 28 U.S.C. § 994(g)**

When enacting the Sentencing Reform Act of 1984, Congress confirmed that the "nature and capacity" of federal prisons is a critical sentencing consideration.[13] For this reason, Congress obligated the Sentencing Commission ("Commission") to formulate guidelines "to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons[.]

Despite this obligation, BOP facilities have historically been, and remain, overcrowded. Adding COVID-19 to the mix has resulted in prisons and jails that are even more dangerous, inhumane, and deadly. The BOP is simply not equipped to handle this global pandemic. Courts and BOP employees have acknowledged as much. "This Court has seen no evidence that the BOP has the capacity to timely and effectively consider the flood of compassionate release motions occasioned by the COVID-19 pandemic—and instead, it seems apparent that the BOP is struggling to handle the crisis within its prison population."[14]

---

[12] See Fed. Bureau of Prisons, BOP: COVID-19 Update, https://www.bop.gov/coronavirus/ (last visited Nov. 6, 2020), (75,449 inmates with either completed or pending tests); Fed. Bureau of Prisons, BOP: Population Statistics, https://bit.ly/3eCgrgT (last visited Nov. 6, 2020) ("154,488 total federal inmates").

[13] 28 U.S.C. § 994(g).

[14] *United States v. McIndoo*, ---F.Supp.3d---, 2020 WL 2201970, at *8 (W.D.N.Y. May 6, 2020); see also Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' Wash. Post (Aug. 24, 2020), https://wapo.st/31CFdd5 ("It's a complete disaster.") Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 79 (Declaration of Shamsher Samra, M.D.) (recognizing that the alleged conditions at Lompoc "make it virtually impossible to ensure the safety of prisoners who remain housed at the facility if the current course is maintained" and the conditions "practically ensure[ ] that all remaining prisoners will eventually contract COVID-19 unless extraordinary measures are taken now"); Emergency Petition for Writ of Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-3, at 4 (Declaration of Meghan Novisky, PhD) ("To be clear, without drastic intervention, may more incarcerated individuals and staff [at FCI Elkton] will become infected and will face elevated risks for medical complications and mor[tality].").

Congress has similarly recognized BOP's failed capacity. On March 27, 2020, Congress passed the CARES Act and authorized the Attorney General to increase the use of home confinement. There is simply no need to imprison Mr. Carpenter given all these considerations, particularly given that his offense was non-violent.

## V. THE COURT SHOULD DEPART FROM THE GUIDELINES RANGE

### A. General Departure

This case is outside the "heartland" of typical cases because the Commission did not consider the COVID-19 pandemic in formulating the Guidelines. COVID-19 is a special and unusual consideration that justifies a lower sentence than the Guidelines provide. USSG 5K2.0(a)(3).[15] The sentencing statute permits a court to depart from a guideline-specified sentence when it finds a mitigating circumstance not adequately taken into consideration by the Commission in formulating the Guidelines. USSG ch.1, pt. A, Introduction, Comment. n. (4)(B).

COVID-19, coupled with the specific characteristics of Mr. Carpenter's prior existing conditions, makes this an atypical case, worthy of a departure.

### B. Specific Departures

#### 1. USSG § 5H1.1: Age

Mr. Carpenter is 60. As a person ages, his risk for severe illness from COVID-19 increases. For example, people in their 50s are at higher risk for severe illness than people in their 40s. Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s. In fact, 8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older.[16]

---

[15] See USSG § 5K2.0(a), (2)(B); *Koon v. United States*, 518 U.S. 81, 95 (1996) (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir. 1993)).

[16] CDC, *Coronavirus Disease 2019 (COVID-19): Older Adults* (last visited Nov. 2, 2020), https://bit.ly/2ZGD5jK (8 out of 10 deaths reported in the U.S. have been in adults 65 and older).

**2. USSG § 5H1.4: Physical Condition**

According to the CDC, adults with asthma or damaged or scarred lung tissue might be at increased risk for severe illness from the virus that causes COVID-19.[17] According to his physician of 20+ years, Mr. Carpenter has a history of "severe lung collapse" and would be at "high risk for severe respiratory complications" should he be exposed to and contract the COVID-19 virus. His current health conditions as set forth in the PSR and Dr. Nagell's letter, exacerbated by the rising COVID-19 infections – which were not considered by the Sentencing Commission – warrant a departure in this case.

## VI. CONCLUSION

Mr. Carpenter respectfully requests this Court consider the extraordinary external prevailing conditions – together with his unique medical concerns – and impose a sentence of home detention, which is reasonable and appropriate given his individual history and characteristics and the possible health implications to him given the COVID-19 pandemic.

Respectfully submitted,

BRIAN CARPENTER
By Counsel

/s/ Pleasant Brodnax
Pleasant S. Brodnax, III
Virginia Bar No. 26477
1701 Pennsylvania Avenue, NW
Suite 300
Washington, D.C. 20006
(202) 462-1100
Pleasant.Brodnax@gmail.com

/s/ Robert Jenkins
Robert L. Jenkins, Jr.
Bynum & Jenkins Law
Virginia Bar No. 39161
1010 Cameron Street
Alexandria, Virginia 22314
(703) 309-0899
RJenkins@BynumAndJenkinsLaw.com

[17] CDC, *People with Certain Medical Conditions,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was filed by CM/ECF on the 11th day of December 2020, which will send a notification of such filing (NEF) to the all counsel of record.

/s/ Pleasant Brodnax
Pleasant S. Brodnax, III